# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARBARA J. GILLESPIE, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 18-60 |
| | : | |
| MAIN LINE HEALTH, | : | |
|     Defendant. | : | |

## MEMORANDUM

**MCHUGH, J.**                                                                                                    **January 7, 2019**

For twenty-six years Plaintiff Barbara Gillespie worked for Defendant Main Line Health and affiliated entities, until her resignation following an institutional campaign to increase worker productivity. She raises claims for unlawful age discrimination and a hostile work environment under state law, and a claim for unlawful discrimination under federal law. If principles of equity controlled this case, a strong argument could be made that she deserved more consideration in light of her many years of loyal service. Unfortunately for Ms. Gillespie, the controlling standard is not one of fairness, and the record does not provide sufficient evidence from which a jury could conclude that her termination was based upon considerations prohibited by law. I am therefore compelled to grant Defendant's Motion for Summary Judgment as to all of Plaintiff's claims.

## I.    FACTUAL RECORD

Plaintiff Barbara Gillespie brings this action under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 962(c), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621. Ms. Gillespie began working for Main Line Health on January 30,

1

1989 and worked as a Patient Resource Representative ("Representative") for the next 26 years until she resigned at the age of 62 on June 19, 2015. As a Representative, Gillespie's responsibilities were to input patient information into the hospital's system, collect insurance information, and order patients' tests. During much of her employment with Main Line Health, Gillespie was proficient in her position, typically garnering an "Effective" rating on her annual performance evaluations. Joint Stat. Fact ¶ 4-20, ECF No. 10-2. Gillespie was deemed a "Solid Performer" in her final two annual evaluations in 2013 and 2014. Joint Stat. Fact ¶ 32, 35. However, she admitted that she has "struggled with her speed for her entire 26-year career" at Main Line Health. Pl.'s Resp. 6, ECF No. 11.

The subject matter of this action largely began between late 2012 and November of 2013 when Gillespie began reporting to two new supervisors: Molly Moses, Supervisor of Outpatient Registration, and Craig Crawford, Site Manager for Patient Access. Around late 2013 or early 2014, Moses and Crawford sought to increase efficiency in Patient Access operations at the hospital and held a meeting with the Representatives about productivity being a new focus and the performance "bar being raised." Pl.'s Dep. 212, ECF No. 11-1. One of the new changes relayed at this meeting was that underperforming Representatives who could not complete patient registrations quickly enough were going to be moved to different registration locations. Gillespie testified that standards were then raised for all the employees in Patient Access.

It is clear from the record that Moses and Crawford were unsatisfied with Gillespie's performance and expressed that dissatisfaction, sometimes in unkind ways, though they never mentioned her age. On one occasion Moses called Gillespie a "slacker" and told her if she wanted her job she was "going to work for it because [Moses was not] paying her to do nothing." Pl.'s Dep. 227-30. Crawford testified that he wondered how Gillespie had been in Patient

2

Access for so long without picking up her speed. Gillespie testified that Moses and Crawford "never mentioned my age, you know, or anything," but that they would say to her "you've been here for long, long time, long, long, long time, really, really long time." Pl.'s Dep. 223. Gillespie also described a casual conversation she had with Moses where they discussed the age of a receptionist and Gillespie volunteered that she was going to be turning 62, to which Moses responded "oh really? Hmm." Pl.'s Dep. 213-15. However, Gillespie testified that she "d[idn't] know if it was a hostile environment because of [her] age." Pl.'s Dep. 227.

As promised, Moses and Crawford began moving underperforming Representatives; Gillespie and four others were moved to new locations due to unsatisfactory speed in completing registrations—Virginia Pollard, Susan Ettoire, Deborah Baily, and Audrey Seidle. Virginia Pollard retired in late 2014 and Susan Ettoire retired in late 2016, both at the age of 65. Ms. Gillespie believes that Pollard retired because she could not stand the new pressures of the position or the moves to different locations. Deborah Baily separated from Main Line Health in 2015 at the age of 47. Audrey Seidle, still employed, was 56 at the time Gillespie resigned in 2015. Based on Main Line Health's personnel records, nineteen Patient Access employees separated from the hospital for varying reasons from 2014 to 2018. Some voluntarily ended their employment, choosing to resign or retire, while others left for personal reasons, disability, or were terminated for misconduct or failing to follow rules. Of these nineteen employees, nine were over 50 years of age and ten were below 40 years of age at the time of their separation from Main Line Health.

In late 2013, Moses and Crawford began shifting Gillespie to different locations in Patient Access with the goal of finding a location where she could be successful. First, Gillespie was moved to patient registration in the Radiology department because registrations there were

less complicated. However, Gillespie encountered a technical issue in the registration system in Radiology where orders she put in would not reach the lab technician, causing extended wait times for patients. Gillespie informed Moses of the issue and asked for help, which Moses eventually provided but not until three months later. Gillespie admitted that she continued to struggle "at certain times" with her speed and accuracy while registering patients in Radiology. Pl.'s Dep. 124.

After some time in Radiology, the Radiology Director and technicians began complaining about long patient wait times. Gillespie was then transferred to a location referred to as the "CATH Lab" where a position was created for her to split time between registering patients and building medical charts. Gillespie admitted that in this position she had less responsibility than the other Representatives. In preparation for the new role, Gillespie received training on how to build the charts and was given time to adjust to the position by splitting her role with another employee. Gillespie did not, however, have individual access to the program necessary to build charts, an issue that she brought to Moses's attention. Moses promised to get Gillespie the program but never delivered on that promise during Gillespie's time in the CATH Lab. As a result, Gillespie had to access her coworkers' programs when they were not using their computers to print what she needed to build charts.

By early 2015, nurses in the CATH lab were complaining that charts were not being completed on time. In response, Gillespie was transferred to another Patient Access location in the Medical Arts Pavilion where she replaced Audrey Seidle as the sole registrar at the location. Gillespie was concerned about this move because Seidle was a "top-speed" registrar and the position was a "high volume job." Pl.'s Dep. 151. Gillespie testified that she agreed that the complaints from Radiology and the CATH Lab were legitimate reasons to move her to another

4

registration location.  In her new position at the Medical Arts Pavilion, Gillespie was tasked with completing walk-in registrations and pre-registrations for patients who had provided information to the hospital but had not yet come in person.  Gillespie started with a lighter workload than the previous Representative with the expectation that she would ease into the position and increase registrations over time.

Around February 26, 2015, Gillespie had a conversation with Moses about an incident when she became overwhelmed and began crying in front of patients.  Gillespie told Moses that she was upset and worried because she felt she was slower than the other Representatives and had replaced an employee who was very efficient.  Moses suggested that Gillespie make an appointment to speak with an EAP (an internal employee support program) counselor to work on maintaining her composure.  Gillespie met with an EAP counselor, Michael Head, on March 2, 2015 and told him that she had stress and anxiety because she felt "harassed" by the pressure to speed up and had gone through multiple location changes.  Head Dep. 16, ECF No. 11-1.  The following day Gillespie met with Moses and Crawford to put together a temporary workplan, limiting her responsibilities to only 25 preregistrations per day, in addition to any patients who walked in and required registration.  Her workload was set to gradually increase until June 1, 2015 when she was expected to take the same number of pre-registrations as the previous Representative.  If Gillespie was unable to meet the workload at that point, Crawford told her that "he'd hate to have to fire [her]."  Pl.'s Dep. 174.

Around May 13, 2015, Moses informed Gillespie that Main Line Health was going to be restricting its registration process, decentralizing registration throughout the hospital, and that she "may not make it" with the new changes.  Pl.'s Dep. 190-91.  On June 11, 2015, Gillespie was called to a meeting with Moses and Crawford.  There they informed her of a patient

registration error she had made back in April, when she initially pre-registered the wrong patient for a blood test and then repeated the error in five subsequent pre-registrations for the same patient. This was a serious error and required the work of multiple departments to detect and correct. In response, Main Line Health issued an "orange" corrective intervention—the hospital's last intervention prior to terminating an employee.

When issuing orange interventions or terminations, Crawford testified that he generates a document called an "SBAR," which then goes to the HR Director, Rhonda Barrison, who reviews it and makes any necessary changes. The SBAR Crawford drafted was entitled "termination." Barrison, however, recommended an orange intervention instead because of the lack of recent formal discipline against Gillespie, the time that had elapsed between the SBAR and the conduct in question, and because she had worked for the past month error free. Crawford testified he never in fact intended to terminate Gillespie, explaining that he often uses the last SBAR drafted as a template, but forgot to delete "termination" on the document.

On June 17, 2015, Gillespie met again with Moses and Crawford to discuss the corrective intervention. There is some dispute over what exactly was said at the meeting: Crawford testified that Gillespie was expected to continue working without making another similarly serious error while Gillespie testified that she was expected to continue working without making *any* future errors. Crawford Dep. 45-47, ECF No. 11-1; Pl.'s Dep. 206-07. However, the parties agree on two things: (1) that Gillespie was given three options, to resign, retire, or continue working error-free and (2) that she was not terminated. Two days later, on June 19, 2015, Gillespie decided to resign because she did not think she could work error-free, she worried about potentially losing a pension if she was terminated, and she was told Main Line Health would not challenge her unemployment benefits if she resigned. In a subsequent email clarifying

6

the nature of the separation for purposes of Gillespie's pension, Barrison asked whether Gillespie wanted the separation to be recorded as retirement or termination.

## II. DISCUSSION

### A. Summary Judgment Standard

This motion is governed by the well-established standards of Fed. R. Civ. P. 56, as amplified by *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986). All record evidence must be construed in the light most favorable to the non-moving party. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 n.8 (3d Cir. 2009).

### B. Legal Analysis

#### 1. Gillespie's Discrimination Claim

The same legal standard applies to both ADEA and PHRA claims of age discrimination making it appropriate to address them together. *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 466 n.1 (3d Cir. 2005). Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on an age discrimination claim, the plaintiff must show by a preponderance of evidence that age was the "but-for" cause of adverse employment action. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)).

Age discrimination claims relying on circumstantial evidence are analyzed under the familiar *McDonnell Douglas* burden shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Willis*, 808 F.3d at 644. The plaintiff must first establish a *prima facie* case of employment discrimination. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). If

the plaintiff states a *prima facie* case, a "relatively light" burden of production shifts to the defendant to offer a legitimate non-discriminatory reason for any adverse employment action it took against the plaintiff. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citation and quotation omitted). After Defendant successfully rebuts the presumption of discrimination raised by Plaintiff's prima facie case, Plaintiff then has the burden to show that Defendant's proffered reasons were pretext for discrimination. *Sarullo*, 352 F.3d at 797. Here, Ms. Gillespie is unable to produce sufficient evidence to either establish a *prima facie* case or to show any of Main Line Health's legitimate reasons are pretext for age-based discrimination.

The central inquiry is whether the plaintiff can establish that the employer is treating some people differently based on a prohibited classification, in this instance age. *Sarullo*, 352 F.3d at 798. The analysis must be tailored to the specific circumstances of a case. *Sarullo*, 352 F.3d at 797-98 *accord Jones v. Sch. Dist. Of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999) ("[A] prima facie case cannot be established on a one-size-fits-all basis."). As Gillespie has not alleged she was replaced with a younger employee, she must show that (1) she is 40 years of age or older; (2) was qualified for the position in question; (3) suffered an adverse employment action; and (4) the adverse action occurred under circumstances that raise an inference of discriminatory animus. *See Sarullo*, 352 F.3d at 797-98.

Main Line Health does not dispute that Gillespie has met the first two prongs of the *prima facie* case. The present inquiry therefore centers on whether Ms. Gillespie has suffered an adverse employment action and whether it occurred under circumstances that raise an inference of age-based discrimination. I am persuaded that Gillespie can, albeit marginally, establish an adverse employment action via constructive discharge and has also produced evidence from which a reasonable juror could find that her transfers to different registration locations

8

constituted an adverse employment action. Ultimately, however, she cannot establish a *prima facie* case because she has not produced evidence that raises an inference of discrimination.

*a. Adverse Employment Actions*

Although the record clearly reflects that Gillespie ended her employment by resigning, she argues that she was constructively discharged because the harassment and working conditions she faced were so onerous she had no other choice but to resign. To determine whether an employee was subject to a constructive discharge under the ADEA, I must determine "'whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign.'" *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d Cir. 2001) (alteration in original) (quoting *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 974 (3d Cir. 1998)). Under controlling precedent, that is a daunting task. It is not enough for an employee to show that resignation was the wisest decision or that the employee subjectively felt compelled to resign. *Connors*, 160 F.3d at 976. Indeed, any basis of the employee's decision, in whole or in part, unrelated to the intolerability of their working conditions will weigh against a finding of constructive discharge. *See Duffy*, 265 F.3d at 171 (finding employee's decision to resign, at least in part, because of her financial ability to do so undermined constructive discharge claim).

However, a pattern of managerial conduct that makes an employee's job more stressful or difficult will not support a constructive discharge if it does not make their job impossible or unbearable. *Duffy* 265 F.3d at 169 (finding no constructive discharge where management may have deliberately withheld staffing assistance making plaintiff's job more stressful and time-intensive but not impossible or unbearable). Employees are not guaranteed a stress-free workplace. *Connors* 160 F.3d at 976. Remarks by an employer about an employee's memory

9

and stamina in relation to their age made several times over the course of employment are inappropriate but not sufficiently derogatory, offensive, or frequent to compel a reasonable person to resign. *Duffy*, 265 F.3d at 170.

The Third Circuit has considered constructive discharge claims under both Title VII and the ADEA. In *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159 (3d Cir. 1993), it recognized a list of factors for courts to consider in evaluating a claim of constructive discharge: (1) threat of termination; (2) suggestion or encouragement to resign or retire; (3) a demotion or reduction in pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; and (6) unsatisfactory job evaluations. *Id.* at 1161. *Clowes* makes clear that claims of "overzealous" supervision are insufficient to establish constructive discharge. *Id.* at 1161-62.

Here, Gillespie has presented evidence that weighs both for and against constructive discharge. Several of the *Clowes* factors fall in her favor. Gillespie was threatened with termination on several occasions leading up to her resignation. Moses told Gillespie she "may not make it" with the coming registration restructuring and Crawford told her "he'd hate to have to fire [her]" if she failed to meet her pre-registration quota in the Medical Arts Pavilion. Taking the record in the light most favorable to Plaintiff, Gillespie was also offered to continue working but to "never make another mistake." Informing an employee that *any* future mistake will result in their termination qualifies as a threat of termination. While she was given the option to stay, there is evidence that she was induced to resign—Main Line Health told her they would not challenge her unemployment. Whether the different registration locations qualify as new "positions" or not, the moves were involuntary and each presented Gillespie with new responsibilities or different registration tasks. Clearly, this caused difficulty for Gillespie, as she

expressed stress and anxiety to the EAP consultant a few months prior to her resignation. The record also indicates Gillespie's performance had come under closer scrutiny while supervised by Crawford and Moses from late 2013 to mid-2015.

However, other evidence in the record weighs against a constructive discharge. There is no allegation that Gillespie's pay or benefits changed during the location transfers and she received satisfactory annual performance evaluations in 2013 and 2014. Similar to *Duffy*, incidents where Gillespie was called a "slacker," told that she had been at Main Line Health for an extremely "long time," and Moses's reaction to Gillespie's age, may have been inappropriate but were isolated and fall far short of the derision or offense necessary to compel a reasonable person to resign. In fact, Gillespie admitted that the sole basis of her allegation of harassment was that she was not working fast enough and that her direct supervisors never mentioned her age.

Moses did appear to make Gillespie's job more difficult and stressful: Gillespie had to wait three months for assistance from Moses with a technical problem in Radiology and was assigned to build charts in the CATH Lab without ever getting the program necessary to do so. However, the record indicates that this technical problem and lack of software did not make her job impossible or unbearable. Moses eventually addressed the issue in Radiology and Gillespie was still able to build charts in the CATH Lab by waiting for her coworkers to finish with the program so that she could print out the charts she needed for that day. Moreover, at the time Gillespie chose to resign, she was working in the Medical Arts Pavilion where none of these issues existed.

The basis of Gillespie's decision to resign further weighs against constructive discharge. Gillespie explained that she decided to resign, at least in part, because she was worried about

losing a potential pension and Main Line Health would not contest her unemployment. Deciding to resign because it is the more attractive economic decision is not consistent with a constructive discharge. *Connors*, 160 F.3d at 974-75.

Overall, the critical inquiry is whether she was subjected to conditions so objectively unpleasant or difficult that resignation was really her only option. *Duffy*, 265 F.3d at 167. Although it is a close question, I find that, when faced with the combination of multiple threats of termination, multiple location changes, the option of working without room for *any* future error, and an employer's offer to resign without challenge to unemployment benefits, a reasonable employee would have felt resignation was her only option. As a result, a jury could conclude that Gillespie was constructively discharged, which qualifies as an adverse employment action. *See Connors*, 160 F.3d at 974.

I now turn to whether Gillespie's location moves also qualify as an adverse employment action. An adverse employment action is one which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey v. Burns*, 390 F.3d 760, 764 (3d Cir. 2004) (internal quotation and citation omitted). Depending on the circumstances, transfers and demotions may be sufficient for an adverse employment action. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999). For example, a transfer where the new position had already been eliminated or where an employee's responsibilities are significantly diminished can qualify as adverse. *Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7 (3d Cir. 1994); *McGrenaghan v. St. Denis Sch.,* 979 F. Supp. 323, 326 (E.D. Pa. 1997).

Gillespie argues that, in addition to her constructive discharge, the harassment and pressure from her supervisors, Crawford's intent to terminate Gillespie, and repeated moves to different registrar positions designed to set her up for failure all constituted adverse employment

12

actions. Pl.'s Resp. 21, ECF No. 11. Her first two arguments are easily dismissed, as Gillespie admitted that the basis of her harassment claim is merely that her supervisors wanted her to speed up her work and Crawford's intent has no relevance to the conditions of her employment. However, evidence exists that, in transferring her, Main Line Health may have set Gillespie up for failure, sufficiently altering the conditions of her employment to qualify as an adverse employment action.

In two instances the reason for her move was connected to a difficulty created or left unaddressed by Moses. In Radiology, Gillespie alleges that she was not given assistance for over three months with a technical problem so that it took longer to process patients. She was then moved from Radiology to the CATH Lab because of complaints of long patient wait-times. When in the CATH Lab, part of her new responsibilities was to build medical charts. But, despite promises, Moses never provided Gillespie with the software necessary to do so, forcing her to rely on other employees to let her print charts at times they were not using their computers. Gillespie was then moved from the CATH lab because nurses were complaining that charts were not being completed in a timely fashion. As to these two instances, I find Gillespie has shown enough that the transfers changed her working conditions enough that a jury could deem them adverse employment actions.

### b. *Inference of Discrimination*

Where a plaintiff has not been directly replaced, the fourth element of a *prima facie* case must be satisfied by providing evidence that raises an inference of age-based discrimination. *See Willis*, 808 F.3d at 644-45. This inference may be demonstrated by showing more favorable treatment of similarly situated, substantially younger employees. *Id.* at 645-46. A Plaintiff's

13

own belief, however, without supporting evidence, is insufficient to establish an inference of discrimination. *Id.*

As in *Willis*, Gillespie's personal belief of age-based discrimination, without more, is insufficient to satisfy the fourth prong of her *prima facie* case. Gillespie's own admissions make clear that no other evidence of age discrimination exists in the record. She admitted that all Representatives were held to the same standard, that she performed more slowly than the other Representatives, and that any harassment she received was related to her supervisor's desire for her to speed up her performance. She also admitted that her transfers to different registration locations were done with the goal of finding a location where she could successfully meet the standard set for Representatives. While Gillespie believes that Main Line Health "targeted" employees over 50 years of age, she presents no evidence of substantially younger, similarly situated employees receiving more favorable treatment. Indeed, the evidence she presents undermines her claim. Records show that from 2014 to 2018 nine employees aged 50 and older *and ten employees aged under 40* separated from Main Line Health for a variety of reasons. While four other employees were moved to new locations, Gillespie presents no evidence about the circumstances precipitating their location changes. The only other evidence Gillespie points to are two isolated incidents where her age was mentioned or possibly implied. As in *Willis*, these passing references to age do not create an inference of discrimination. 808 F.3d at 646. Regardless, Gillespie also admitted that her supervisors "never mentioned my age - you know - or anything." Pl.'s Dep. 223.

Gillespie is correct that to establish a *prima facie* case she must only raise a rebuttable presumption of discrimination by eliminating the most common non-discriminatory reasons for why she was moved to different locations. *Texas Dept. of Comm. Aff.'s v. Burdine*, 450 U.S.

14

248, 253-54 (1981). But as low as the bar may be, Gillespie has failed to clear it. She has not produced any evidence upon which a reasonable juror could make an inference that she was discriminated against because of her age. As a result, she cannot establish a *prima facie* case under the ADEA.

### c. Legitimate Non-Discriminatory Reasons

Even if Gillespie had raised a rebuttable presumption of age discrimination, Main Line Health has produced legitimate non-discriminatory reasons for giving Gillespie the option to resign and for moving her to different registration locations. First the offer to resign was provided because Gillespie had asked Crawford what her options were if she could not meet Main Line Health's performance expectations. Second, as set forth earlier in greater detail, Main Line Health moved Gillespie to Radiology, the CATH Lab, and the Medical Arts Pavilion in response to her issues with job performance to try to potentially find a location where Gillespie could succeed, albeit with less than complete support. Particularly given Gillespie's own admissions about her performance and the reasons she was moved to different locations, Main Line Health has clearly set forth legitimate and non-discriminatory reasons for the transfers.

### d. Showing of Pretext

After the defendant successfully rebuts the presumption of discrimination raised in the plaintiff's *prima facie* case, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the employer's proffered reasons for the adverse employment action were pretext for unlawful discrimination. *Sarullo*, 352 F.3d at 797. In order to demonstrate pretext, the employee "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a

15

motivating or determinative cause of the employer's action." *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (quotation and citation omitted). It is not enough to show Main Line Health was wrong or mistaken; Ms. Gillespie must show that the proffered explanations are so weak, implausible, incoherent, or inconsistent that they are "unworthy of credence." *Id*. Such disbelief, in combination with evidence from a *prima facie* case, may be sufficient to show intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). Plaintiff's ultimate burden to show pretext is to present evidence sufficient to permit a reasonable juror both to disbelieve Main Line Health and to believe that the real reason was intentional discrimination. *See id*.

Gillespie's pretext argument suffers from the same flaws as her *prima facie* case. While she has pointed to evidence that she was constructively discharged and that the conditions of her employment were altered when transferred to different registration locations, she produces no evidence other than her own belief that those actions were connected to her age. Gillespie admitted that all the Representatives were held to the same standards. Moreover, she agrees that the reasons provided by Main Line Health *are* worthy of credence—she admitted in her deposition testimony that the complaints from the nurses, techs, and the Director of Radiology were all legitimate reasons to move her to a different location.

Gillespie argues that a dispute exists over whether Crawford intended or attempted to terminate Gillespie, but this dispute is immaterial. Even if Crawford had terminated Gillespie, there is no evidence that any such termination was connected to her age. In conclusion, Gillespie has not produced evidence from which a reasonable factfinder could disbelieve Main Line Health's proffered reasons were pretext for discrimination and she therefore cannot succeed on a claim for age-based discrimination under the ADEA or PHRA.

16

### 2. Gillespie's Hostile Work Environment Claim

As mentioned previously, age discrimination claims brought under the PHRA and ADEA are analyzed together under the same framework. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002). Though the Third Circuit has not squarely decided that the ADEA permits a claim for hostile work environment, it has held that Title VII and ADEA caselaw are "routinely use[d] . . . interchangeably, when there is no material difference in the question being addressed." *Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 666 (3d Cir. 1999) (internal quotation and citation omitted). Additionally, district courts in this Circuit have assumed the viability of such a claim and I will do the same. *See, e.g.*, *Logan v. Countrywide Home Loans*, No. 04-5974, 2007 U.S. Dist. LEXIS 20088, at *39-40 (E.D. Pa. Mar. 15, 2007); *Barthold v. Briarleaf Nursing & Convalescent Ctr. Nursing Home*, 2014 WL 2921534, at *4 (E.D. Pa. June 27, 2014); *Tate v. Main Line Hosps., Inc.*, No. 03-6081, 2005 U.S. Dist. LEXIS 1814, at *60 (E.D. Pa. Feb. 8, 2005).

Thus, for a hostile work environment claim under the PHRA and ADEA, Gillespie must show that (1) she suffered intentional discrimination because of her age; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected Gillespie herself; 4) the discrimination would detrimentally affect a reasonable person in similar circumstances; and 5) the existence of respondeat superior liability. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013); *Parrillo v. Lower Bucks Cnty. Joint Mun. Auth.*, No. 02-CV-0413, 2003 U.S. Dist. LEXIS 23729, at *20-21 (E.D. Pa. Dec. 18, 2003). Whether a work environment is hostile requires a review of the totality of the circumstances, including the frequency, severity, and nature of the discriminatory conduct as well as whether it unreasonably interfered with the employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Off-hand

17

comments and isolated incidents (unless they are extremely serious) are not sufficiently severe or pervasive to amount to discriminatory changes in the terms and conditions of employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation and citation omitted); *Logan*, 2007 U.S. Dist. LEXIS 20088, at *42-44 (finding age-related comments every two to three months insufficiently frequent to be severe or pervasive).

Here, Gillespie's admissions make clear she cannot meet the first prong of a hostile work environment claim. Gillespie admitted that she believed she was harassed because she was not working as fast as Moses wanted and that she did not know if it was a hostile environment because of her age. She admitted that she was slower than her fellow registrars even though everyone was held to the same standard. She even prefaces a description of an instance of what she felt was poor treatment with the admission that her supervisors never mentioned her age. Gillespie points to no facts linking her supervisors' comments, the lack of support she received during the location transfers, or any harassment to her age.

Even if Gillespie had shown intentional discrimination, none of the treatment she alleges qualifies as sufficiently severe or pervasive. She alleges only a handful of instances and, while the pressures from her supervisors to speed up may have had an impact on her performance, it is not unreasonable for management to try to hold its employees to a single standard. As a result, Gillespie has not produced evidence to support a claim for hostile work environment.

### III. CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment is granted as to both Plaintiff's age discrimination claim and hostile work environment claim.

                                        /s/ Gerald Austin McHugh
                                        United States District Judge